*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0336
A14-0385**

In the Matter of the Welfare of the Children of: J. J. and C. F., Parents

**Filed August 18, 2014
Affirmed
Connolly, Judge**

St. Louis County District Court
File Nos. 69DU-JV-13-227, 69DU-FA-11-910, 69DU-JV-13-851

Amy E. Lukasavitz, Duluth, Minnesota (for appellant-mother J.J.)

Terri Port Wright, Cloquet, Minnesota; and

Keith Shaw, Duluth, Minnesota (for appellant-father C.F.)

Mark Rubin, St. Louis County Attorney, Benjamin M. Stromberg, Assistant County Attorney, Duluth, Minnesota; and

Laura Vedder, Sara Marie Westrum, Leech Lake Band of Ojibwe, Cass Lake, Minnesota (for respondent Leech Lake Band of Ojibwe)

Susan Love, Duluth, Minnesota (guardian ad litem)

Considered and decided by Connolly, Presiding Judge; Johnson, Judge; and Hooten, Judge.

UNPUBLISHED OPINION

**CONNOLLY**, Judge

In these consolidated appeals, appellants challenge the district court's termination of their parental rights. Appellant-mother argues that the district court abused its discretion in finding that respondent county made active efforts to prevent the breakup of their Indian family and in concluding that termination of her parental rights was in the children's best interests. Appellant-father argues that his court-appointed attorney did not adequately represent him. Because we see no abuse of discretion and no ineffective assistance of counsel, we affirm.

## FACTS

C., born July 19, 2007, and D., born July 25, 2008 are the biological children of appellant-mother, J.J., and appellant-father, C.F. C. and D. are members of, or are eligible for membership in, an American Indian Tribe, namely the Leech Lake Band of Ojibwe.

On February 25, 2013, respondent St. Louis County received a report that, on February 22, C. and D. had been dropped off at a relative's home without clothing or other basic provisions. At that time, C.F. was incarcerated and J.J.'s whereabouts were unknown. The report stated that both C.F. and J.J. were homeless and had a history of dropping the children off with anyone who would take them.

On February 28, 2013, the county petitioned for C. and D. to be found children in need of protection or services (CHIPS). At an emergency protective-care hearing,

custody of C. and D. was granted to the county for continued out-of-home placement. Neither C.F. nor J.J. attended the hearing.

On May 29, 2013, the children were adjudicated CHIPS and a case plan was ordered. J.J. attended only two of approximately 11 hearings during the year that the case was pending before the district court, and she did not appear until nearly eight months after C. and D. were removed from her care. The social worker explained to J.J. what she needed to do to get started on the case plan, but J.J. did not follow the instructions or attempt to visit the children. Although C.F., at first, participated in visitation, and he and the children enjoyed their time together, he did not work on any other part of the case plan; as of October 2013, his progress on the plan had regressed.

On October 16, 2013, J.J. appeared for the first time at a hearing and asked to voluntarily terminate her parental rights. The district court wanted her to consult with counsel before terminating her rights, and J.J. applied for counsel. After J.J. failed to appear at subsequent hearings, or to work on any part of the case plan, the district court terminated J.J.'s parental rights by default.

On February 4, 2014, C.F. appeared for trial on the termination-of-parental-rights (TPR) petition with his attorney. C.F. requested that the trial be continued because he had recently entered chemical-dependency treatment following a probation violation and wanted a continuance in order to prove his sobriety. The district court denied the request, noting that the CHIPS matter had been before the court for nearly a year and that a continuance was not consistent with achieving permanency for the children. C.F. then asked to voluntarily terminate his parental rights rather than proceed to trial, in part

3

because C.F.'s girlfriend was then pregnant and he did not want to jeopardize his parental rights to her unborn child.[1]

Both J.J. and C.F. appealed; their appeals were consolidated. J.J. challenges the district court's finding that the county made active efforts to reunite the family and the conclusion that terminating her parental rights was in her children's best interests; C.F. challenges the adequacy of his legal representation.

## D E C I S I O N

"[Appellate courts] review the termination of parental rights to determine whether the district court's findings address the statutory criteria and . . . are supported by substantial evidence and . . . not clearly erroneous." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). "[O]n appeal from a district court's decision to terminate parental rights, we will review the district court's findings of the underlying or basic facts for clear error, but we review its determination of whether a particular statutory basis for involuntarily terminating parental rights is present for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012). "Pursuant to the Indian Child Welfare Act, 25 U.S.C. § 1912(f), in a termination of parental rights matter involving an Indian child, the standard of proof is beyond a reasonable doubt." Minn. R. Juv. Prot. P. 39.04, subd. 2(b).

---

[1] *See* Minn. Stat. § 260C.503 subd. 2(4) (2012) (noting that the social services agency must ask the county attorney to immediately file a petition for termination of parental rights when a parent has lost parental rights to another child through an order involuntarily terminating that parent's rights).

4

## I.     Active Efforts to Reunite the Family

The Indian Child Welfare Act (the ICWA) requires the petitioning party in a proceeding to terminate parental rights to an Indian child to show beyond a reasonable doubt that "active efforts" were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts were unsuccessful. 25 U.S.C. § 1912(d) (2012) (requiring active efforts); *In re Welfare of M.S.S.*, 465 N.W.2d 412, 418 (Minn. App. 1991) (requiring proof of active efforts beyond reasonable doubt). The ICWA does not define active efforts, but the Minnesota Tribal/State Agreement defines active efforts as

> a rigorous and concerted level of case work that uses the prevailing social and cultural values, conditions and way of life of the Indian child's tribe to preserve the child's family and to prevent placement of an Indian child and, if placement occurs, to return the child to the child's family at the earliest time possible.

Minn. Dep't of Human Serv's, 2007 Tribal/State Agreement 9 (2007), *available at* http://edocs.dhs.state.mn.us/lfserver/Legacy/DHS-5022-ENG. Active efforts have been found where a parent refused to participate in the proceedings in a timely fashion and placed unreasonable restrictions on his receipt of services. *See, e.g.*, *In re Welfare of Children of J.B.*, 698 N.W.2d 160, 170 (Minn. App. 2005).

J.J. argues that there was no evidence beyond a reasonable doubt showing that active and reasonable efforts had been provided to prevent the children's out-of-home placement; specifically, she argues that no evidence indicates that she was given a written copy of the reunification plan or that anyone explained it to her. But the record shows

that: (1) J.J. was given proper notice of the proceedings, (2) she attended only two of approximately 11 hearings, (3) she did not visit the children while they were out of her care, and (4) she did not follow through with the social worker's instructions on how to start the case plan. Thus, J.J. refused to avail herself of any rehabilitative services; this does not equate to such services not being provided to her.

## II. The Best Interests of the Children

An appellate court reviews "a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *J.R.B.*, 805 N.W.2d at 905. The law leaves "scant if any room for an appellate court to question the [district] court's best-interests considerations." *In re Child of Evenson*, 729 N.W.2d 632, 635 (Minn. App. 2007), *review denied* (Minn. June 19, 2007).

Parental rights may be terminated for any one of nine statutory reasons. Minn. Stat. § 260C.301, subd. 1(b) (2012). The paramount consideration in determining whether parental rights will be terminated is the best interests of the child. Minn. Stat. § 260C.301, subd. 7 (2012); *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003). "Where the interests of the parent and the child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7.

The district court found that five of the nine criteria existed here: (1) J.J. abandoned C. and D. (Minn. Stat. § 260C.301, subd. 1(b)(1)); (2) J.J. refused or neglected to comply with her parental duties to provide for the children's basic needs; active and reasonable efforts have failed; and further efforts would be futile (Minn. Stat. § 260C.301, subd. 1(b)(2)); (3) J.J. is palpably unfit to be a party to the parent-child

6

relationship (Minn. Stat. § 260C.301, subd. 1(b)(4)); (4) following the out-of-home placement, reasonable and active efforts have failed to correct the conditions that led to placement (Minn. Stat. § 260C.301, subd. 1(b)(5)); and (5) the children are neglected and in foster care (Minn. Stat. § 260C.301, subd. 1(b)(8)). The district court also found:

> Given the fact that [J.J.] has not had any recent contact nor shown any interest in the children, any interests in preserving the [parent-child] relationships are nominal at best. By contrast, the children are currently placed with siblings in the home of a relative who is committed to being an adoptive resource. Based on this, termination of parental rights is clearly in the children's best interests.

J.J. argues that the district court failed to make adequate findings that there was proof beyond a reasonable doubt that the children's best interests would be served by terminating the parent-child relationship. *See Matter of Welfare of D.T.J.*, 554 N.W.2d 104, 110 (Minn. App. 1996) ("An order for the termination of parental rights must explain the district court's rationale for concluding why the termination is in the best interests of the children.")

But the district court describes the "best interest" factors throughout the TPR order, noting that: (1) J.J. did not cooperate with her case plan, (2) her living arrangements and whereabouts were unknown, (3) she willfully failed to visit her children and abandoned them, (4) she had multiple warrants out for her arrest, and (5) she had been incarcerated. An expert witness stated in an affidavit that J.J.'s and C.F.'s custody of their children was likely to result in serious physical and/or emotional damage to the children and that termination of their parents' rights was in their best interests. Because the finding that termination of J.J.'s parental rights is in the children's best

interests is supported by the record, any of the five statutory criteria would be a sufficient basis for the termination of J.J.'s parental rights. Minn. Stat. § 260C.301, subd. 1(b).

J.J. relies upon *Tanghe* to argue that the district court did not sufficiently address the "best interest" factors. But *Tanghe* is distinguishable: in that case, the district court made no findings about the children's best interests. 672 N.W.2d at 625. Here, the district court made specific findings on the best-interests factors, and its findings are reflected throughout the order.

The district court did not abuse its discretion by terminating J.J.'s parental rights.

## III. Adequacy of C.F.'s Representation

C.F. argues that his trial counsel was ineffective. The standard for ineffective assistance of counsel is well established. A complainant must show that "trial counsel was not reasonably effective and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *In re the Welfare of L.B.*, 404 N.W.2d 341, 345 (Minn. App. 1987) (quoting *Strickland v. Washington*, 566 U.S. 668, 104 S. Ct. 2052 (1984)). There is a strong presumption that counsel's representation was reasonable. *State v. Pearson*, 775 N.W.2d 155, 165 (Minn. 2009).

C.F. argues first that his counsel was ineffective because the attorney was not yet registered on the Minnesota CHIPS Parent Attorney Registry (the registry) as required by Minn. Stat. § 260C.163, subd. 3 (f), (g) (2012) (providing that counsel appointed by the district court to represent parents in juvenile court proceedings must either (1) have at least two years of experience in handling child-protection cases or (2) have taken an

8

approved course in handling child-protection cases or (3) be supervised by an attorney who meets either (1) or (2)).[2] However, if a district court cannot access an attorney who meets these qualifications and finds none is available, it may appoint another attorney whom it determines to be otherwise competent. Minn. Stat. § 260C.163 subd. 3; *see also* Minnesota Judicial Branch Policy 604, "*Qualifications for Attorneys Appointed by the Court to Represent Parents, Guardians, and Legal Custodians in Juvenile Protection Matters*," (Minn. Judicial Council, June 1, 2013).

C.F. provides no legal authority for his implied view that legal assistance provided by any attorney not on the registry is ineffective. This court does not address allegations unsupported by legal analysis or citation. *Ganguli v. Univ. of Minnesota*, 512 N.W.2d 918, 919 n.1 (Minn. App. 1994). Therefore, the issue is not properly before us. Moreover, nothing in the record supports C.F.'s assertion that his counsel was not on the registry, and "[a]n appellate court may not base its decision on matters outside the record on appeal." *Thiele v. Stich*, 425 N.W.2d 580, 582-83 (Minn. 1988).

C.F. also asserts ineffective assistance because he was inadequately informed of his trial rights. Again, he cites no authority to support his contention that the waiver of his trial rights was uninformed, nor does he give any explanation of how he was prejudiced by this error. *See L.B.*, 404 N.W.2d at 345 (one criterion of ineffective-assistance claim is showing that "but for counsel's unprofessional errors, the result of the proceeding would have been different").

---

[2] C.F. acknowledges that "in late April, 2014" his attorney was added to the roster of qualified attorneys.

Finally, C.F. argues that his counsel was ineffective because he failed to raise issues with various provisions of the ICWA, 25 U.S.C. §§ 1901-1963, and to inform C.F. of the correct standard of proof. While C.F.'s counsel misspoke at the voluntary termination hearing and referred to both the proof-beyond-a-reasonable-doubt standard and the clear-and-convincing standard when questioning C.F. on his waiver of trial rights, there was no prejudice to C.F. because counsel for the Leech Lake Band of Ojibwe clarified that the burden of proof standard is beyond-a-reasonable-doubt, not clear-and-convincing. The district court commented, "I know I heard beyond a reasonable doubt, so if I misspoke or somebody else misspoke, I think everybody is on the same page for that." Any misstatement of the evidentiary standard did not constitute ineffective assistance of counsel.

C.F. also argues that his counsel was ineffective because the ICWA requires testimony of a qualified expert witness that "continued custody of the child by the parent … is likely to result in serious emotional or physical damage to the child," *see* 25 U.S.C. § 1912(f), and no such testimony was provided. This argument fails for two reasons. First, 25 U.S.C. § 1912(f) does not apply because C.F. was a noncustodial parent and is therefore not protected by the provisions of 25 U.S.C. § 1912(f). *Adoptive Couple v. Baby Girl*, __ U.S. _, 133 S. Ct. 2552, 2559-2562 (2013) (holding that ICWA's requirement that qualified expert testimony be provided that continued custody by the parent will be damaging to the child does not apply to a parent who has never had custody). Second, the appropriate testimony was provided by affidavit prior to the trial and is referenced in the court's TPR order, and the ICWA does not require qualified

10

expert-witness testimony at each hearing but rather before the court orders termination of parental rights. *See* 25 U.S.C. § 1912(f).

C.F. also argues that his counsel was ineffective because the ICWA requires the court to certify that the parent understands the terms and consequences of the consent in English or that the consent be interpreted into a language the parent understands, *see* 25 U.S.C. § 1913(a), and C.F.'s attorney did not confirm that C.F. understands the English language. But C.F. testified by affidavit that he understands the English language, so this argument lacks merit.

Finally, C.F. argues that counsel was ineffective by not informing C.F. of his right to withdraw his consent to the voluntary termination of his parental rights prior to the entry of the final order for termination. *See* 25 U.S.C. § 1913(c). Again, this argument is defeated by C.F.'s affidavit, which states that he understood this provision of the ICWA. Because there were no violations of the provisions of the ICWA and C.F. was informed of his trial rights and his rights under the ICWA, he does not have a claim for ineffective assistance of counsel.

**Affirmed.**

11