*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0981
A16-1012
A16-1014**

In the Matter of the Welfare of the Children of:
R. P., B. G., C. M. F., and A. M. H., Parents.

**Filed January 9, 2017
Affirmed
Smith, Tracy M., Judge**

St. Louis County District Court
File Nos. 69HI-JV-15-187, 69HI-JV-15-41

Bill L. Thompson, Law Office of Bill L. Thompson, Duluth, Minnesota (for appellant father B.G. in A16-0981)

Hannah N. Casey Forti, Chisolm, Minnesota; and Kimberly Corradi, Corradi Law Office, Hibbing, Minnesota (for appellant mother R.P. in A16-1012)

Jaclyn Corradi Simon, Sellman, Borland & Simon, PLLC, Hibbing, Minnesota (for appellant intervenor/grandmother C.B. in A16-1014)

Mark S. Rubin, St. Louis County Attorney, Gayle M. Goff, Assistant County Attorney, Hibbing, Minnesota (for respondent St. Louis County Public Health and Human Services)

C.M.F., Wausau, Wisconsin (pro se respondent father)

A.M.H., Virginia, Minnesota (pro se respondent mother)

Shireen Lee, Virginia, Minnesota (guardian ad litem)

Considered and decided by Smith, Tracy M., Presiding Judge; Johnson, Judge; and Reyes, Judge.

**UNPUBLISHED OPINION**

**SMITH, TRACY M.**, Judge

Appellant-parents R.P. and B.G. appeal from the termination of their parental rights based on four of the grounds in Minn. Stat. § 260C.301, subd. 1(b) (2016), challenging the findings as clearly erroneous and unsupported by the evidence. Appellant-grandmother C.B. appeals from the denial of her petition for transfer of custody, arguing that the district court abused its discretion in its analysis of the children's best interests and in not placing the children together. C.B. also challenges the district court's denial of her motion for judgment as a matter of law or a mistrial. R.P. asserts that she received ineffective assistance of counsel at trial. The record supports the district court's conclusion that R.P.'s and B.G.'s parental rights should be terminated, the district court did not err in denying C.B.'s petition and motions, and R.P. has not established that she received ineffective assistance of counsel. We therefore affirm.

## FACTS

This petition concerns the welfare of five minor children: X.P., J.G., B.G. III, I.G., and A.G. Appellant B.G. is the biological father of J.G., B.G. III, I.G., and A.G. Appellant R.P. is the biological mother of X.P., B.G. III, I.G., and A.G. Appellant C.B. is the paternal grandmother of J.G., B.G. III, I.G., and A.G., and an important friend of X.P. K.V., who is not a party in this proceeding, is the paternal great-grandmother of J.G., B.G. III, I.G., and A.G. C.M.F. is the biological father of X.P. and has had no role in X.P.'s upbringing. A.M.H. is the biological mother of J.G. and has had no role in J.G.'s upbringing.

R.P. and B.G. have been in a relationship and primarily living together with their children since approximately 2007. For most of that time, they lived in K.V.'s house, along with K.V. and C.B. The children mostly have been cared for by R.P., B.G., C.B., and K.V. together. Since 2007, R.P. and B.G. have each been absent from K.V.'s house on more than one occasion for inpatient chemical-dependency treatment or incarceration. R.P. and C.B. also each moved out for temporary periods due to conflicts with family members. R.P. took her biological children to live with her outside of K.V.'s house and without B.G. at least once.

St. Louis County Public Health and Human Services (the county) has been involved with the family since 2007 concerning the children's absences from school, inadequate supervision, neglectful living conditions, and allegations that the parents were abusing drugs and selling prescription medication.

The children were placed in foster care after a first child-protection petition was filed in May 2011. The petition was dismissed, and the children returned to K.V.'s house in September 2011. In December 2011, a second child-protection petition was filed on behalf of the children. The children were adjudicated to be children in need of protection or services (CHIPS) on June 12, 2012. At that time, B.G. was incarcerated and R.P. was in inpatient chemical-dependency treatment. C.B. and K.V. were caring for the children. B.G. stayed in two different chemical-dependency and mental-health treatment facilities following his release from prison. He returned to K.V.'s house in February 2013. The second CHIPS file was closed in June 2013.

On June 12, 2014, the county received a report that some of the children were playing in a dumpster in the rain and were without adult supervision. A social worker went to K.V.'s house to talk with B.G. and R.P. in response to the report. They discussed concerns regarding the condition of the home, supervision of the children, keeping the children's medical appointments, and the parents allegedly driving without licenses.

In July 2014, R.P. and all of the children except J.G. moved out of K.V.'s house and into R.P.'s sister's residence. Three or four days later, the social worker visited K.V.'s house and became "alarmed" about its condition. He found dead mice in the bathroom, cat feces and the odor of cat urine throughout the house, cupboards full of dirty and moldy dishes, cigarettes and pills on the floor, and a large knife on the floor next to a mattress. There was "a crib in the kitchen that was full of dirty dishes and things" and clothes that "looked like they had mold on them" all over the steps to the basement. The house also had "sewer issues." The social worker testified that when he confronted R.P. about the condition of K.V.'s house, R.P. said she would not move back there because C.B. was smoking marijuana daily in front of the children and K.V. was selling prescription pills.

In August 2014, the county received a report that R.P. had pointed a gun at two of the children's heads. R.P. said it was a BB gun and denied having pointed it at the children. On the same day, there was a report that B.G. and C.B. were smoking marijuana and that C.B. and K.V. were selling prescription pills. B.G. and C.B. told the social worker that they did smoke marijuana but not in front of the children. That month, the county determined that the family needed ongoing family services and assigned a new social worker to the case.

4

On September 23, 2014, the county responded to a report that R.P. and the children had been living in an apartment for a month but had moved out, "leaving the place filthy" and leaving behind a spoon containing drug residue. The children were allowed to return to K.V.'s house pursuant to a safety plan that required the parents to refrain from using drugs and to begin or continue chemical-dependency treatment.

On November 5, 2014, C.B. found R.P. with K.V.'s prescription pills. R.P. admitted to a social worker that she had taken the pills, and added that C.B. had been smoking marijuana in front of the children and that C.B. and K.V. were selling prescription drugs. R.P. also told the social worker that C.B.'s friend was living in K.V.'s house and using intravenous drugs.

On November 13, 2014, R.P. and B.G. agreed to have their children voluntarily placed in foster care. The children were placed in two separate homes. The parents were allowed to visit the children at one of the foster homes, and K.V. was allowed to take the children to their medical and therapy appointments. In December, the parents agreed to out-of-home safety plans.

R.P. completed a rule 25 evaluation and entered inpatient chemical-dependency treatment. She was discharged from treatment after one week for seeking drugs, and, as a result, she was sentenced to prison for violating probation. She was in prison from January to May 2015, and then was returned to prison from July to September 2015 for a drug-related parole violation.

The county filed a CHIPS petition in March 2015 and filed a petition for termination of parental rights in August 2015. In October 2015, C.B. petitioned for transfer of permanent legal and physical custody of all five children.

Trial was held on 11 days from November 2015 through April 2016. On the ninth day of trial, after the county rested its case, C.B. moved for judgment as a matter of law on her petition for transfer of custody. In the alternative, she moved for a mistrial because the district court failed to conclude the case within 30 days pursuant to Minn. R. Juv. Prot. P. 39.02. The district court denied both motions. On the tenth day of trial, R.P.'s trial counsel stipulated to the admissibility of R.P.'s parenting-evaluation report.

The district court concluded that the parental rights of B.G. and R.P. to their children should be terminated under Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5), and (8), based on clear and convincing evidence. The district court also concluded that it is not in the best interests of the children that their legal custody be transferred to C.B. The district court terminated the parental rights of R.P. and B.G., denied C.B.'s petition for transfer of custody, and transferred guardianship and legal custody of the children to the Minnesota Commissioner of Human Rights. The district court terminated the parental rights of C.M.F. to X.P. and of A.M.H. to J.G. because they had abandoned their respective children and were in default.[1]

B.G., R.P., and C.B. appeal.

---

[1] The terminations of C.M.F.'s and A.M.H.'s parental rights are not challenged on appeal.

**D E C I S I O N**

**I.  The record supports the termination of R.P.'s and B.G.'s parental rights under Minn. Stat. § 260C.301, subd. 1(b)(2).**

Our review of a district court's decision to terminate parental rights is "limited to determining whether the findings address the statutory criteria, whether those findings are supported by substantial evidence, and whether they are clearly erroneous." *In re Welfare of D.D.G.*, 558 N.W.2d 481, 484 (Minn. 1997). We will affirm a termination of parental rights if "at least one statutory ground for termination is supported by clear and convincing evidence and termination is in the child's best interests." *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). We apply a clear-error standard of review to a district court's finding that a petitioner has proved a statutory ground for termination of parental rights. *In re Welfare of A.D.*, 535 N.W.2d 643, 648 (Minn. 1995). But we "closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008).

The district court found that the county proved by clear and convincing evidence that the parental rights of B.G. and R.P. to their children should be terminated under Minn. Stat. § 260C.301, subd. 1(b)(2). That provision allows termination of parental rights upon a finding that

> [1] the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able, and [2] either reasonable efforts by the social services

7

agency have failed to correct the conditions that formed the basis of the petition or reasonable efforts would be futile and therefore unreasonable.

Minn. Stat. § 260C.301, subd. 1(b)(2).

### A. Parents have neglected to comply with duties.

The district court found that the parents substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed on them by the parent-and-child relationship. Clear and convincing evidence supports this finding.

The district court made the following findings showing that the neglect of parental duties has been substantial, continuous, and repeated: The county has been involved with R.P., B.G., and their children since 2007 due to concerns about the parents' illegal drug use and chemical dependency, adults in the house selling prescription drugs, inadequate supervision of the children, neglectful living conditions, and the children's excessive absences from school; the county has filed CHIPS petitions on behalf of the children three times, in May 2011, December 2011, and March 2015; and after the second petition was resolved in 2013, only about one year passed before the county intervened again due to reports that the children were unsupervised. These findings are supported by clear and convincing evidence in the record.

Clear and convincing evidence also supports the district court's finding that the children did not receive the necessary shelter, care, and control. Several witnesses testified to unhygienic and unsafe living conditions in the family's primary residence. Testimony and exhibits show that the children were not adequately supervised at times and that X.P. was sometimes left to care for her four siblings, including an infant, when she was ten years

8

old or younger. The record also shows that all of the children have special needs and that R.P. and B.G. had trouble remembering and bringing the children to their appointments. Clear and convincing evidence also supports the district court's finding that R.P. and B.G.'s struggles with chemical dependency have interfered with their ability to parent.

The district court found that the parenting arrangement has been inconsistent, as both R.P. and B.G. have been absent from the home on multiple occasions due to incarceration and chemical-dependency treatment, and R.P. and C.B. have left for substantial periods due to fighting among household members. The district court also found that R.P. has taken four of the children to live somewhere else without B.G. at least once. The district court found that K.V. "has been the most consistent and stable caregiver for the children" and that B.G. "has always relied on other people to help care for the children and his involvement in the care of the children's basic needs has been very limited by his psychological problems, his physical ailments, chemical dependency issues and treatments, and incarcerations." These findings are supported by clear and convincing evidence.

In their appellate briefs, R.P. and B.G. do not concede that they neglected their parental duties, but they do not challenge any specific findings by the district court on the issue. Based on our review of the findings and the record, we conclude that the district court's finding that R.P. and B.G. have substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon them by the parent-and-child relationship is supported by clear and convincing evidence. *S.E.P.*, 744 N.W.2d at 385; *D.D.G.*, 558 N.W.2d at 484.

**B. Reasonable efforts by the county have failed to correct conditions.**

R.P. and B.G. focus their challenge to this statutory ground for termination on the district court's findings regarding the reasonableness of the efforts by the county to correct conditions that formed the basis of the petition.

**1. Closing date of prior CHIPS file**

R.P. and B.G. assert that the district court's conclusions relied on the erroneous finding that the previous CHIPS file was closed on June 11, 2014, when the file actually closed in June 2013.[2] The district court relied on the 2014 date to conclude that there was no break in the family's need for services because, on June 12, 2014, the county received a report that the children were not properly supervised. We agree with appellants that the finding that the second file was closed in 2014 is unsupported by the record, and the district court's reliance on that date was erroneous. There is, however, sufficient evidence in the record to support the termination of R.P.'s and B.G.'s parental rights even if we disregard the district court's clearly erroneous finding that the second CHIPS petition closed in 2014. This error is therefore harmless, and we do not reverse for harmless error. *In re Welfare of Children of D.F.*, 752 N.W.2d 88, 98 (Minn. App. 2008).

**2. Timeline of reasonable efforts**

R.P. and B.G. also assert that the district court erred by considering all services the family has received since 2007 in its evaluation of whether the county made reasonable efforts to correct the conditions that led to the March 2015 CHIPS petition. They argue

---

[2] C.B. makes the same argument in her challenge to the district court's decision to deny her petition for transfer of custody.

that, because the statute permits termination if "reasonable efforts by the social services agency have failed to correct *the conditions that formed the basis of the petition*," the "reasonable efforts" to be considered must be limited to those provided after the petition was filed. Minn. Stat. § 260C.301, subd. 1(b)(2) (emphasis added).

We disagree that the only reasonable efforts that may be considered are those provided after the petition was filed. The statute requires a showing of reasonable efforts provided after the appearance of the conditions that form the basis of a CHIPS petition, and those conditions necessarily predate the petition. In its findings, however, the district court described the longer history of services provided to this family and did not specifically identify the services related only to the current CHIPS petition. However, because the record supports the ultimate conclusion that there were reasonable efforts within the relevant time frame and that those efforts failed to correct the conditions that led to the March 2015 CHIPS petition, the district court's conclusion is not erroneous.

After the prior CHIPS file was closed in June 2013, the event that prompted the county to get involved with the family again was the June 12, 2014 report that the children were playing in a dumpster unsupervised. The record shows that the county remained involved with the family regularly from that incident through the March 2015 filing, and that the same conditions that the county discovered when following up on the June 2014 report were still of concern by the time the petition was filed. We therefore consider all services provided after the June 2014 incident to be part of the county's reasonable efforts to correct the conditions that ultimately led to the March 2015 CHIPS petition.

11

The record shows that, after the June 2014 incident, the county provided B.G. supervised visitation with the children, intensive family-based services, family group decision-making services, a psychological parenting evaluation, and chemical-dependency treatment. B.G. argues that the chemical-dependency treatment should not be considered part of the county's reasonable efforts because it was mandated in a separate legal proceeding. But B.G.'s chemical dependency was a significant factor necessitating the CHIPS petition, and his sobriety was consistently identified as an essential condition for returning the children home. We see no reason why treatment that was directed at correcting a condition that led to the CHIPS petition but was provided as a result of an additional proceeding should not be considered as part of the county's reasonable efforts to correct conditions leading to the petition. B.G. does not cite to caselaw indicating that the services he received after June 2014 are legally insufficient, and he does not identify any services that the county should have provided but failed to provide. We conclude that the record supports the finding that the county made reasonable efforts to correct the conditions leading to the petition with respect to B.G.

The record shows that after the June 2014 incident, the county offered R.P. a referral to a homeless shelter, a psychological parenting evaluation, supervised visitation with the children, and permission to join intensive family-based services offered to B.G. R.P. argues that the intensive family-based services and some of the visitation should not be considered because R.P. was unable to participate while she was incarcerated. But R.P. brought about her incarceration by failing to comply with probation and parole conditions forbidding the use of illegal drugs. No law requires a district court to stay a juvenile-

12

protection case due to a parent's incarceration, and R.P. does not cite to caselaw indicating that the services she received are legally inadequate. We conclude that the record supports the finding that the county made reasonable efforts to correct the conditions leading to the petition with respect to R.P.

The record also supports the district court's conclusion that the county's reasonable efforts failed to correct the conditions leading to the petition. The conditions that led to the petition included R.P.'s and B.G.'s drug abuse, inadequate supervision of the children, X.P. being left responsible for much of the care of the other four children, and neglectful living conditions in the home. By the end of trial, the parents' drug problems had not been corrected. R.P. failed to complete a chemical-dependency treatment program because she was kicked out for seeking drugs and subsequently sent to prison twice for drug-related violations of probation and parole. She tested positive for methamphetamine and amphetamine during trial in April 2016. B.G. completed a treatment program, but he still tested positive for marijuana during trial in December 2015.

Social-worker testimony and the parenting evaluations also support the district court's finding that neither parent had made significant improvements in their parenting abilities by the time trial began. The record supports the district court's finding that B.G. has ongoing problems resulting from a traumatic brain injury that impair his ability to provide adequate supervision and living conditions for the children, and that those ongoing problems have not significantly improved with services. The record also supports the district court's finding that R.P.'s mental illnesses and coping mechanisms prevent her from complying with parenting duties and have not improved with services.

13

We therefore affirm the termination of R.P.'s and B.G.'s parental rights under Minn. Stat. § 260C.301, subd. 1(b)(2). Because a termination of parental rights only needs to be based on one of the statutory grounds, we do not address the other three grounds on which the district court based its termination decision. *See* Minn. Stat. § 260C.301, subd. 1(b); *R.W.*, 678 N.W.2d at 55.

## II. The district court did not abuse its discretion in denying C.B.'s transfer-of-custody petition.

C.B. argues that the district court abused its discretion in denying her petition for transfer of custody. She asserts that the county had a burden to prove that placement with C.B. would be detrimental to the children, which it did not meet, and that the district court did not adequately address the best-interest factors of Minn. Stat. § 260C.212 (2016) with respect to her petition.

### A. The county was not required to prove that placement with C.B. would be detrimental to the children.

C.B. asserts that district court abused its discretion in denying her petition because it allowed some of the children to be placed with non-relatives despite the preference for placing children with a relative. She cites *In re Welfare of M.M.*, in which the Minnesota Supreme Court held that, upon termination of the parental rights of a child's only parent, there was a preference to place the child with a relative, and the party opposing placement with a relative had a burden to "make an affirmative showing that the first preferred placement would be detrimental to the child." 452 N.W.2d 236, 239 (Minn. 1990).

But *M.M.* was interpreting a 1988 statute that explicitly required courts "in the absence of good cause to the contrary" to place a child in the custody of a relative unless

14

that would be "detrimental to the child" or a relative is not available. *Id.*; Minn. Stat. § 260.181 (1988). That statute was repealed in 1999 and has been replaced in relevant part by section 260C.212, subdivision 2. 1999 Minn. Laws ch. 139, art. 4, § 3. The current statute still prefers placement with relatives and important friends, but it no longer contains the strong language requiring placement with a relative "in the absence of good cause" or unless such placement would be "detrimental to the child." Minn. Stat. § 260C.212, subd. 2(a) (2016). Thus, under the current statute, the county was not obligated to show that placement with C.B. would be detrimental to the children, and denying C.B.'s petition without such a showing was not an abuse of discretion.

> **B.** **The district court did not abuse its discretion in its analysis of the best interests of the children with respect to C.B.'s petition for transfer of custody.**

C.B. argues that the district court erred in denying her petition for transfer of custody because it is in the children's best interests to be placed with her. The district court may order permanent legal and physical custody to a fit and willing relative "in the best interests of the child[ren]." Minn. Stat. § 260C.515, subd. 4 (2016). In deciding whether to transfer permanent legal and physical custody to a relative under section 260C.515, subdivision 4, the district court must make "individualized determinations under section 260C.212, subdivision 2, paragraph (b), of the needs of the child and of how the selected home will serve the needs of the child." Minn. Stat. § 260C.193, subd. 3(a) (2016). Section 260C.212 requires the court to ensure that each child's best interests are met by requiring an "individualized determination of the needs of the child and of how the selected placement

15

will serve the needs of the child being placed." Minn. Stat. § 260C.212, subd. 2(a). The district court must consider the following factors in determining the needs of the child:

(1) the child's current functioning and behaviors;
(2) the medical needs of the child;
(3) the educational needs of the child;
(4) the developmental needs of the child;
(5) the child's history and past experience;
(6) the child's religious and cultural needs;
(7) the child's connection with a community, school, and faith community;
(8) the child's interests and talents;
(9) the child's relationship to current caretakers, parents, siblings, and relatives;
(10) the reasonable preference of the child, if the court . . . deems the child to be of sufficient age to express preferences;

*Id.*, subd. 2(b).

We review a district court's decision regarding whether to transfer legal custody for an abuse of discretion. *In re Welfare of Children of A.I.*, 779 N.W.2d 886, 895 (Minn. App. 2010), *review dismissed* (Minn. Apr. 20, 2010). We conclude that the district court did not abuse its discretion in its analysis of the statutory factors because it made findings addressing the necessary factors and those findings were supported by substantial evidence in the record.

The district court's findings on the section 260C.212, subdivision 2(b) factors are set out in paragraph 35 of its findings of fact. The district court discussed each of the factors individually and made detailed factual findings relevant to each one. The district court cited to evidence in the record to support the findings. For each of the factors for which the children's needs or circumstances are distinct, the district court either discussed

16

each of the children and his or her needs individually or referred to such discussion elsewhere in the findings.

The district court also made detailed findings about C.B.'s physical and mental health problems and her reliance on personal-care attendants to care for her own basic needs. The findings on the children's needs, in conjunction with the findings on C.B.'s personal limitations, support the district court's ultimate conclusion that transfer of custody to C.B. is not in the children's best interests.

The district court's findings in this section are supported by substantial evidence in the record. C.B. does not challenge any of the specific factual findings in this section as clearly erroneous or unsupported by substantial evidence. Instead, she relies on evidence that she argues should weigh in her favor. But our review is limited to whether the district court abused its discretion in denying C.B.'s petition. We conclude that it did not.

## III. The district court did not abuse its discretion by not placing all of the children together.

C.B. argues that the district court abused its discretion in allowing the children to remain in four different foster homes rather than transferring custody of all five to C.B. so they would not be separated.

> Siblings should be placed together for foster care and adoption at the earliest possible time unless it is documented that joint placement would be contrary to the safety or well-being of any of the siblings or unless it is not possible after reasonable efforts by the responsible social services agency.

Minn. Stat. § 260C.212, subd. 2(d).

17

The district court concluded that it was not possible to place the children together "because there were no available homes that could accommodate" all five children. C.B. argues that this is erroneous because she was willing to care for all the children at her new residence in Grand Rapids, Minnesota, and the county failed to make reasonable efforts to explore that option. The county argues that it does not need to consider C.B. any more than it already has because C.B. was involved in caring for the children when they were in R.P. and B.G.'s custody at K.V.'s house, and none of the adults in that household, including C.B., were able to follow a safety plan and put the children's best interests first.

C.B. correctly asserts that there is no evidence in the record establishing that the county considered a plan in which the children would be in C.B.'s custody at C.B.'s Grand Rapids residence. C.B. therefore asks either that she be granted custody or that the county be required to investigate her suitability as a possible permanent placement for any or all of the children. But, because the district court properly concluded that it is not in the children's best interests to transfer custody to C.B., it would be futile to require the county to investigate this option. Thus, the district court did not err in concluding that it is not possible to place all five children together, meaning that separation of the children was permissible under Minn. Stat. § 260C.212, subd. 2(d).

## IV.  The district court did not err in denying C.B.'s motions for judgment as a matter of law or for a mistrial.

After the county rested its case, C.B. moved the district court to grant her petition for transfer of permanent legal and physical custody because the county had not met its burden. The district court interpreted this motion as a motion for judgment as a matter of

18

law. But judgment as a matter of law is available in jury trials under Minn. R. Civ. P. 50.01(a). The Minnesota Rules of Civil Procedure are inapplicable to juvenile-protection matters "[e]xcept as otherwise provided by statute or [Minnesota Rules of Juvenile Protection Procedure]." Minn. R. Juv. Prot. P. 3.01. The juvenile-protection rules do not provide for judgment as a matter of law, and no statute makes Minn. R. Civ. P. 50.01(a) applicable to juvenile-protection proceedings. The district court's denial of C.B.'s motion was not erroneous.

C.B. also asserts that the district court erred in denying her motion for a mistrial because the district court failed to conclude the case within the timeline required by Minn. R. Juv. Prot. P. 39.02. The interpretation of a juvenile-protection rule is a legal question that we review de novo. *In re Welfare of R.S.*, 805 N.W.2d 44, 48-49 (Minn. 2011).

In a "trial regarding a termination of parental rights matter or other permanent placement matter . . . testimony shall be concluded within [30] days from the date of commencement of the trial and wherever possible should be over consecutive days." Minn. R. Juv. Prot. P. 39.02, subd. 1(c).

Here, the trial convened on November 17, 18, 19, and 20, and December 11, 15, 18, and 28 of 2015, and then resumed after a three-month break for hearings on April 1, 5, and 15 of 2016. Thus, testimony was not concluded within 30 days from the date of commencement of the trial. *See* Minn. R. Juv. Prot. P. 39.02, subd. 1(c). The trial was delayed in part because the judge was seeking treatment for a medical problem.

Rule 39.02 does not identify a remedy for a court's failure to comply with timing requirements, and neither party cited to authority identifying a remedy. C.B.'s suggested

remedy, a mistrial, would have resulted in a new trial. Minn. R. Juv. Prot. P. 39.02, subd. 3. C.B. has not explained how holding a new trial would have repaired any harm that may have been caused by delaying the trial beyond the prescribed 30-day period. It seems instead that her suggested remedy would have detracted from the goal of the timing rule by delaying the matter even longer. We therefore decline to reverse the district court's denial of C.B.'s motion for a mistrial.

## V.     R.P. has not established that she received ineffective assistance of counsel.

R.P. argues that she received ineffective assistance of counsel because her trial attorney stipulated to the admissibility of her parenting-evaluation report.

To establish ineffective assistance of counsel, the complainant must show that trial counsel was not reasonably effective and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *In re Welfare of L.B.*, 404 N.W.2d 341, 345 (Minn. App. 1997) (quotation omitted).

R.P. asserts that the report "provided evidence that was highly damaging" to her and that the district court "heavily relied" on it. She argues that the report is hearsay and that because of the stipulation, she was not able to cross-examine the evaluator who prepared it. But R.P. has not identified any particular facts that the district court would not have been able find without the report, and she has not explained why the outcome probably would have been different without the stipulation. If R.P.'s counsel had not stipulated to the admissibility of the evaluation, the county likely would have called the evaluator to testify and the same information would have been brought before the court that way,

20

leading to the same result.  R.P. has not shown that there is a reasonable probability that the result of the proceeding would have been different if her trial counsel had not stipulated to the admissibility of the parenting evaluation.  Therefore, she has not established that she received ineffective assistance of counsel.  *See id.* at 345.

**Affirmed.**